Turnbull, Inc., Transferee 1 (formerly J. Gordon Turnbull, Inc.) v. Commissioner. Turnbull, Inc. v. CommissionerDocket Nos. 1285-62, 95189.United States Tax CourtT.C. Memo 1963-335; 1963 Tax Ct. Memo LEXIS 10; 22 T.C.M. (CCH) 1750; T.C.M. (RIA) 63335; December 24, 1963Leslie C. Hackler, Jr., and Wentworth T. Durant, for the petitioners. Charles B. Sklar, for the respondent. DAWSONMemorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined deficiencies in the income tax of petitioners, as follows: Turnbull, Inc., Transferee YearDeficiency1954$127,354.99195530,547.50Price Construction Company Taxable Year EndedDeficiencyApril 30, 1958$19,788.36*11 In the case of Turnbull, Inc., Transferee, Docket No. 1285-62, the petitioner claims overpayments for the years 1954 and 1955 in the amounts of $12,700.78 and $3,209.43 respectively. The parties have settled some issues by stipulation which will be given effect under Rule 50. The issues remaining for decision are: 1. Is Turnbull, Inc., liable as transferee for deficiencies determined as due for the years 1954 and 1955 from H. R. Henderson & Company, transferor? 2. Are collections received during 1954 and 1955 on accounts receivable sold to Price Construction Company taxable to J. Gordon Turnbull, Inc., and includable in the consolidated taxable income of H. R. Henderson & Company and affiliate for each of those years? 3. Was the respondent's adjustment decreasing the 1954 consolidated taxable income of H. R. Henderson & Company and J. Gordon Turnbull, Inc., in the amount of $5,211.83 correct? 4. Are claimed deductions for legal and professional services in the consolidated return of H. R. Henderson & Company and J. Gordon Turnbull, Inc., for 1954 ordinary and necessary business expenses? 5. Is Price Construction Company entitled to a net operating loss deduction in its*12 fiscal year ended April 30, 1958, as a result of a net operating loss carry forward from its fiscal year ended April 30, 1953? Findings of Fact Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by reference. J. Gordon Turnbull, Inc., was organized under the laws of the State of Ohio in August 1941 and maintained its home office in Cleveland, Ohio. The principal source of income of J. Gordon Turnbull, Inc., was from fees received for engineering, architectural, and construction management services rendered in connection with the building of military bases, manufacturing plants, and other large structures. J. Gordon Turnbull was the controlling stockholder, president and general manager of the corporation until his death in April 1953. After a statutory merger on December 31, 1957, in which J. Gordon Turnbull, Inc., absorbed H. R. Henderson & Company, the surviving corporation's name was changed to Turnbull, Inc. H. R. Henderson & Company was a corporation organized under the laws of the State of Texas on January 3, 1946. It maintained its principal office in Marshall, Texas, and engaged primarily*13 in highway construction. H. R. Henderson & Company was in existence through December 31, 1957, when it was merged into its subsidiary, J. Gordon Turnbull, Inc. Price Construction Company was incorporated under the laws of the State of Texas on May 1, 1948, and maintained its principal place of business in Marshall, Texas. Price Construction Company was engaged in general contracting. These corporations maintained their books and records and elected to report their income for income tax purposes as follows: Account-ing Meth-ReportingCorporationodYearH. R. Henderson & Com-CashCalendarpanyJ. Gordon Turnbull, Inc.CashFiscal,Turnbull, Inc., (afterNov. 30merger)CashCalendarPrice Construction Com-AccrualFiscal,panyApril 30For its fiscal years ended November 30, 1952, and November 30, 1953, J. Gordon Turnbull, Inc., filed its income tax return with the district director in Cleveland, Ohio. J. Gordon Turnbull, Inc., filed a separate income tax return for the taxable year December 1, 1953, through February 4, 1954, with the district director, Cleveland, Ohio. For its taxable year February 5, 1954, through December 31, 1954, and*14 for each of its calendar years 1955, 1956, and 1957, J. Gordon Turnbull, Inc., filed a consolidated income tax return with its parent corporation, H. R. Henderson & Company. These consolidated returns were filed with the district director, Dallas, Texas. Following the merger, the surviving corporation, Turnbull, Inc., filed its income tax return for its taxable year 1958 with the district director in Cleveland, Ohio. For each of its 8 fiscal years ended April 30, 1951, through April 30, 1958, and for its taxable year May 1, 1958, through October 31, 1958, Price Construction Company filed its income tax returns with the district director, Dallas, Texas. On December 15, 1953, the board of directors of H. R. Henderson & Company authorized its president, Cameron McElroy, Jr., to investigate the possibilities of purchasing J. Gordon Turnbull, Inc., and on January 18, 1954, he was authorized to purchase the stock of that company for any amount less than $1,150,000. In making this authorization one of the factors considered by the board was that a sizeable part of the purchase price could be obtained from the Turnbull organization. On January 25, 1954, the 1624 shares of J. Gordon*15 Turnbull, Inc., stock outstanding were owned by the Estate of J. Gordon Turnbull (1294 shares) and Susan A. Turnbull (330 shares). The corporation held 376 shares of treasury stock. On January 25, 1954, B. C. McElroy and Cameron McElroy submitted to the Estate of J. Gordon Turnbull, deceased, and Susan A. Turnbull an offer to purchase all of the outstanding shares of J. Gordon Turnbull, Inc., for a sum of $975,000. On January 27, 1954, Susan A. Turnbull accepted this offer individually and on behalf of the Estate of J. Gordon Turnbull by a telegram addressed to Cameron McEiroy, Marshall, TexasFunds for the purchase of the outstanding shares of J. Gordon Turnbull, Inc., were provided: By H. R. Henderson & Company:Borrowed from Cameron McElroyand H. R. Henderson$ 25,000.00Borrowed from J. Gordon Turn-bull, Inc.801,108.37Total$826,108.37By J. Gordon Turnbull, Inc., (treas-ury shares)148,891.63Total$975,000.00On or about February 4, 1954, H. R. Henderson & Company acquired all of the outstanding shares of J. Gordon Turnbull, Inc., for a total price of $975,000 paid as follows: Paid by H. R. Henderson &Company to: No. ofSharesAmountSusan A. Turnbull330$198,121.92J. Gordon Turnbull Estate1,046627,986.45Total amount paid byH. R. Henderson & Co.$826,108.37Paid by J. Gordon Turnbull,Inc., to: Estate of J. Gordon Turn-bull248$148,891.63Totals1,624$975,000.00*16 As specified in the offer to purchase dated January 25, 1954, Susan A. Turnbull purchased from J. Gordon Turnbull, Inc., for cash the following assets at their book value as of December 31, 1954: 1/2 ton Chevrolet truck$ 1,036.081952 Cadillac3,537.03Moraga Drive property56,111.15San Fernando ranch118,280.50Chester Avenue property49,068.17Ranch machinery and equipment12,087.47Total$240,120.40As of December 31, 1946, and through April 15, 1958, the outstanding stock of H. R. Henderson & Company had been issued as follows: Number ofPercent-NameSharesageH. R. Henderson32032Cameron McElroy, Jr.48048B. C. McElroy, Sr.10010E. Key, III10010Total1,000100On December 18, 1953, the board of directors of Price Construction Company authorized Earnest F. Smith to investigate the accident claims pending against J. Gordon Turnbull, Inc., to determine, if they could be defended with a reasonable amount of cost. From his knowledge of the circumstances of the accident McElroy believed the suits could be defended reasonably. After discussing the case with attorneys representing various defendants, *17 Smith reported to the board on January 15, 1954, that he believed the cases could be disposed of with a reasonable amount of expense, and several board members were directed to negotiate for the purchase of the receivables. After the death of J. Gordon Turnbull, which occurred on April 1, 1953, estimates were made of income accrued for services which had been rendered from the Kansas City office of J. Gordon Turnbull, Inc., as of July 1, 1953. The corporation assigned the uncompleted contracts or job agreements in the Kansas City office to E. G. Novak, the manager of its Kansas City office, for completion. After April 1, 1953, J. Gordon Turnbull, Inc., accepted no new work until February 4, 1954. By February 4, 1954, the uncollected balances due J. Gordon Turnbull, Inc., for services rendered on jobs up to that date, and the amount due on mortgages were estimated by J. Gordon Turnbull, Inc., to be as follows: Description of Account ReceivablePercentJobBalance DueCompletedof Comple-No.Name of JobJ.G.T. Inc.as oftionOther Explanation5213Baptist Hospital, Kans. City$ 23,549.157- 8-535120Warrensburg Housing5,722.257- 1-535114U.S. Air Force6,118.006-18-53100%Invoiced for $6,816.505121U.S. Air Force16,356.497- 8-53995323U.S. Air Force247.907- 1-535710% retainage5225Beckett on Hallmark19,646.227- 1-535314Hallmark2,046.907- 1-535313Beckett for Hallmark1,423.637- 1-535112Kans. City Power & Light Co.9,107.707- 1-531005226Kans. City Power & Light Co.2,443.147- 1-531005122City of Warrensburg7,634.587- 1-531005105General Motors Corp.4,132.427- 1-531004719Veterans Hospital118,989.287- 8-53100Claimed $134,559.28: E. G. Novak expectedto receive more than$118,989.285207Lockheed Aircraft Corp.42,489.007- 8-53various4808PBrunsen Instrument Co.01951Cost on job $3,195.84;collection doubtful.5211U.S. Army-Reynolds Plant37,052.216-10-53Terminated for con-venience of Govt.5202Reynolds Metals65,726.255304U.S. Army-Reynolds Metals5,500.006-10-53Terminated for con-venience of Govt.5215General Motors Corp.9,831.18O. L. Betswenger, note due 12-31-53,Marine Corp. note secured1,000.00By house and land at 11,239 Lake ShoreBlvd., Bratenahl, Ohio; due in equalpayments to be made on 11-1-54 and11-1-5520,000.00E. G. Novak (due for materials con-veyed 7-1-53)21,510.68Total$420,526.98*18 Acting under the authority of a resolution passed by its board of directors on February 4, 1954, J. Gordon Turnbull, Inc., executed an agreement to sell the above receivables and mortgages to Price Construction Company. Under terms of the assignment Price Construction Company was to pay $50,000 in cash and execute a 4 percent, 90-day promissory note for $150,000, or a total of $200,000, and to assume any liability determined against Turnbull as a result of suits filed against it as follows: 1. A claim for breach of contract damages filed by Jerry Clements in the U.S. District Court for the Western District of Arkansas, No. 551, in the amount of $3,950. 2. A claim for damage filed by copartners, William G. Reed, C. H. Bacon, and John Priest with the Superior Court, Los Angeles, California, No. 611,219, in the amount of $38,250. 3. All claims against J. Gordon Turnbull, Inc., resulting from an accident at the Reynolds Metals Company, Gregory, Texas, plant on November 15, 1951, for which nine plaintiffs filed for the aggregate amount of $532,895. The $50,000 in cash paid to J. Gordon Turnbull, Inc., on February 4, 1954, under the provisions of the agreement to sell the receivables, *19 was advanced to Price Construction Company by H. R. Henderson and Cameron McElroy through two cashier's checks, each in the amount of $25,000. The acquisition of the accounts receivable was entered on the Price Construction Company journal and posted to the ledger as follows: DebitCreditAccounts ReceivableJ. Gordon Turnbull,Inc.$420,526.98Notes payable - J. Gordon Turn-bull, Inc.$150,000.00H. R. Henderson and CameronMcElroy50,000.00Reserve for uncollectible accountsand liability on lawsuit corpus220,526.98To record acquisition of accountsreceivable from J. Gordon Turn-bull and acceptance of liabilityon lawsuit at corpus.The same transaction was entered on the books of J. Gordon Turnbull, Inc., as follows: DebitCreditAccounts receivable mis-cellaneous - Price Con-struction Company$ 50,000.00Notes receivable -Price ConstructionCompany150,000.00Accounts receivable - E. G. Novak$ 20,273.80Notes receivable - Marine Corp.20,000.00Notes receivable - O. L. Beiswenger1,000.00Fee income158,726.20On its income tax returns, J. Gordon Turnbull, Inc., reported*20 as gain from the sale of receivables the following amounts: TaxableYear EndedAmount2/ 4/54( 66/365 X $158,726.20)$ 28,701.1712/31/54(299/365 X $158,726.20)130,025.03Total$158,726.20After February 4, 1954, J. Gordon Turnbull, Inc., received and entered on its books payments totaling $469,608.34 ($423,777.25 from February 4 through December 31, 1954, and $45,831.09 during 1955) on these uncollected accounts as follows: Total Payments Received DuringAmountFebruary 1954$ 85,976.37March 195482,480.12April 195449,202.68May 195460,500.27June 1954115,449.45July 19543,077.61August 195424,400.00December 19542,690.75January 19552,500.00February 195543,331.09Total$469,608.34 Upon collecting these amounts, J. Gordon Turnbull, Inc., immediately transmitted them to Price Construction Company. Price Construction Company reported part of the proceeds from the collection of these accounts receivable as income in its fiscal year ended April 30, 1954, and the balance in its fiscal year ended April 30, 1955. Price Construction Company made the following payments to J. Gordon Turnbull, Inc., in*21 satisfaction of its $150,000 note: Date of PaymentAmount2-17-54$ 50,000.004- 5-5425,000.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,000.005-26-545,000.006- 7-5415,000.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,000.007- 2-5410,000.008- 4-545,000.00Total$150,000.00As of February 4, 1954, J. Gordon Turnbull, Inc., had a basis of $41,273.80 in its accounts receivable. This amount was allowed as a basis deduction in the notice of deficiency issued for the year ended December 31, 1954, in Docket No. 1285-62. As of April 17, 1952, and until August 26, 1952, the outstanding shares of Price Construction Company were owned as follows: Stock OwnershipStockholderSharesPercentW. R. Price29949.83Marvin Pound1.17Cameron McElroy29949.83B. C. McElroy1.17Total600100.00On August 26, 1952, Cameron McElroy acquired all the stock owned by W. R. Price in consideration for which Cameron McElroy transferred certain personal property to W. R. Price and assumed all obligations of Price Construction Company for which W. R. Price might be held liable. At the stockholder's meeting of Price Construction Company on September 19, 1952, Cameron McElroy, who*22 then owned at least 598 of the 600 shares outstanding, authorized the distribution of the 299 shares he had acquired from Price to various persons, but principally to H. R. Henderson, B. C. McElroy, and E. Key, Jr. After this distribution of September 19, 1952, the outstanding shares of Price Construction Company were owned as follows: Stock OwnershipStockholderSharesPercentCameron McElroy29949.83H. R. Henderson17128.50B. C. McElroy589.67E. Key, Jr., and/or his estate579.50O. H. Clark111.82Marvin Pound1.17B. C. Burba1.17W. L. Cravens, Jr.1.17George Pendergast, Jr.1.17Total600100.00Prior to December 1, 1953, O. H. Clark, George Pendergast, Jr., W. L. Cravens, Jr., B. C. Burba, and Marvin Pound transferred their stock in Price Construction Company (a total of 15 shares) to Cameron McElroy. Then Cameron McElroy redistributed the outstanding shares as follows: Changes in Stockholding Shares OutstandingSharesPrior to 12-1-5312-1-53 - 2-4-54IssuedStockholders9-19-52Increase(Decrease)NumberPercentVarious -Clark, Pendergast, Cravens, Burba,Pound15(15)Cameron McElroy299(179)12020H. R. Henderson171(3)16828B. C. McElroy5826010E. Key, Jr., and/or his estate5736010John M. Henry727212W. D. Henderson606010Earnest F. Smith606010Totals600197(197)600100%*23 The shares outstanding on December 1, 1953, remained the same at least through February 4, 1954. For each of the 3 fiscal years prior to its acquisition of accounts receivable from J. Gordon Turnbull, Inc., Price Construction Company's total liabilities exceeded its total assets, and it had reported operating losses on each of its income tax returns which losses were available to be carried forward and offset against future income. The excess of liabilities over assets and the net operating loss in each year were: Particulars4-30-514-30-524-30-53Total Liabilities$260,230.06$121,172.68$354,655.16Total Assets239,384.2460,907.13185,571.48Excess of Liabilities over Assets$ 20,945.82$ 60,265.55$169,083.68Net Operating Loss($100,450.20)($ 41,319.73)($108,818.13)As recognized by the board of directors of H. R. Henderson & Company, it was well known that Cameron McElroy was closely associated with both Price Construction Company and H. R. Henderson & Company, and that the financial and business welfare of Price Construction Company was closely related to and had a substantial effect on the business of H. R. Henderson & Company, *24 particularly Henderson's ability to secure further contracts. To avoid the problems which would have resulted from foreclosure on Price's assets or the bankruptcy of the company, the directors of H. R. Henderson & Company on April 10, 1952, agreed to pay Price Construction Company's debt to the First National Bank, Marshall, Texas, and thereafter continued to provide Price Construction Company with funds to carry on its operations in spite of its heavy losses. Henderson & Company also made efforts to secure profitable contracts for Price. From the collections on the accounts receivable acquired from J. Gordon Turnbull, Inc., Price Construction Company was able during 1954 to return most of the funds furnished it by H. R. Henderson & Company. During the years involved both Price Construction Company and H. R. Henderson & Company maintained their office in the same building on Pinecrest Drive West, Marshall, Texas. During 1955 Robert G. Maloney, an employee of H. R. Henderson & Company, also kept the books for Price Construction Company. As of November 30, 1953, J. Gordon Turnbull, Inc., estimated its earned income from its accounts receivable, or the completed portion of jobs*25 in process at $539,957.25. In estimating its 1954 income from these accounts, J. Gordon Turnbull, Inc., reduced the total income of $539,957.25 by a reserve totaling $26,997.86, which was shown as a valuation reserve on its accrual basis balance sheet at November 30, 1953. This amount of reserve was considered adequate to cover the larger amount of receivables, including the Veterans Hospital job number 4719, which was included at $118,989.28, the same value at which it was assigned to Price Construction Company. Prior to the assignment of the accounts receivable to Price Construction, each job was studied, the determined percentage of completion verified, an analysis made of previous payments, and the balance due as of February 4, 1954, was conservatively calculated to be $420,526.98. Within 13 months following their assignment $469,608.34 was collected on these accounts. J. Gordon Turnbull, Inc., estimated its 1954 income tax on work in process would be $219,436.36, which sum it showed as a reserve on its accrual basis balance sheet. It recognized that it would be liable for income tax on its accounts receivable from the completed portion of its jobs in process. Under the*26 terms of the agreement for the assignment of accounts receivable dated February 4, 1954, between J. Gordon Turnbull, Inc., and Price Construction Company, Price assumed any contingent liability Turnbull might have as a result of an accident which occurred on November 15, 1951, during the construction of the Reynolds Metals Company plant at Gregory, Texas. For the construction of its plant at Gregory, Reynolds Metals Company, the landowner, entered into six prime contracts, one with H. R. Henderson & Company and Henry C. Beck Company, who acted as general contractor as a joint venture, one with the petitioner, who was the architectural engineer, and four others. James Stewart Company was a subcontractor who built the storage silo in which the accident occurred. On November 15, 1951, during the construction of an ore storage silo at the Reynolds plant, an accident occurred when a scaffolding or platform supported by reinforcing bars extending inside the silo collapsed. Twwnty-two or 23 men who were on the scaffolding when it collapsed were injured, and of these one, Vincent Charo, was killed. The injured men were all employed by James Stewart Company or another James Stewart Corporation. *27 James Stewart Company had drawn the plans for the actual construction of the silo in which the accident occurred. It also had control over the method of construction to be used in building the silo. The method of using a platform supported by reinforcing bars was decided upon and executed by James Stewart Company. It was not specified by J. Gordon Turnbull, Inc., and was not a part of its design. As architectural engineer, Turnbull was responsible for drawing the plans for the finished product, the design of the entire plant, including specifications and working drawings, but they did not draw the construction plans for the actual building of the silo. Turnbull's duty of inspection on the premises was to determine that the finished product complied with their plans and specifications, as for example, ascertaining that the proper concrete mixture was being used. It was not its job to control in any way a subcontractor or his method of installation. As a result of the accident at the Reynolds Metals plant eight tort suits were filed. Seven of these actions sought damages for personal injuries and one for alleged wrongful death (Mary Lamar Charo). In each case, by the original or*28 amended petition, four defendants were named: H. R. Henderson & Company, Inc., Henry C. Beck Company, Reynolds Metals Company, and the petitioner. Each of these suits was filed by a person employed by James Stewart Company at the time of the injury, or by such person's representative. Hubert L. Stone, Jr., was attorney for each of the plaintiffs, and the original petitions were filed on the following dates: DocketDate Peti-PetitionerNumbertion FiledManuel Garcia, Sr.823812-31-52Lloyd G. Bazar83715-15-53Antonio Vasquez818610-25-52Antonio Canales83765-15-53Everett O. Rippee84307- 3-53Mary Lamar Charo817410-11-52L. D. Bolter858611-13-53Ramon Maldonado85199-12-53Stone, as attorney for the plaintiffs, investigated the accident, including examining the contracts, the plans for the finished project, and the plans for construction of the silo, as well as talking to witnesses, and taking statements and depositions. Based on the information so obtained he determined what parties to name as defendants in the tort suits he filed. At the time the petitions were filed Stone believed he had the best chance for recovery*29 against H. R. Henderson & Company, Henry C. Beck Company, and Reynolds Metals Company. At no time did he feel he had sufficient evidence to establish a prima facie case against Turnbull, but since it had duties on the premises where the accident occurred, it was necessary under Texas procedure to name J. Gordon Turnbull, Inc., as a codefendant in order to prevent the possible use of the sole proximate cause doctrine to bar any recovery. In August 1953, Stone arranged to take the deposition of Femister, the project manager for Beck and Henderson. The deposition was to be taken in Dallas, Texas. Eldon Dyer, attorney for J. Gordon Turnbull, Inc., believed at that time that Stone could not establish a prima facie case against it and felt that he could not justifiably charge it with the expense of his traveling from Corpus Christi to Dallas to attend the deposition. Stone told Dyer at that time that although he could not agree to a motion for summary judgment, he also believed he did not have a prima facie case against Turnbull. Based on his analysis of the cases, Stone disagreed with any prospect of liability on the part of Turnbull. Under the terms of the contract, the Beck-Henderson*30 joint venture was required to indemnify Reynolds Metals Company against any loss from any cause of action arising from work done under the contract. In its contract with Beck-Henerson, James Stewart Company agreed to accept and assume all the liabilities, duties, and responsibilities created by the contract between Reynolds and Beck-Henderson. Since the contract of J. Gordon Turnbull, Inc., was directly with Reynolds, there was no privity of contract between the injured employees of James Stewart Company and petitioner. Furthermore, Reynolds retained control over the premises and there was no significant delegation of control to Turnbull. Eldon Dyer discussed the privity of contract with Stone about 10 days prior to the Femister deposition which was taken in August 1953. During November 1951, J. Gordon Turnbull, Inc., carried a comprehensive general liability policy with Bankers Indemnity Insurance Company, and a general liability policy with Employers Casualty Company. The insurance coverage under each policy was $50,000. Employers Casualty Company was first notified of the accident by a letter dated January 13, 1953, from W. D. McArthur. Bankers Indemnity Company was similarly*31 advised, as McArthur's letter was written to both companies. Bankers Indemnity Insurance Company disclaimed liability under its policy, but Employers Casualty Company undertook to investigate and defend the cases after receiving a non-waiver of rights agreement from Turnbull. Falsgraf, Reidy, and Shoup, attorneys for Turnbull, believed that Bankers Indemnity Insurance Company was still liable under the provisions of the insurance policy and had no grounds for disclaiming liability. They advised Bankers that Turnbull did not waive any of its rights under its policy and would hold them responsible for all expenses and judgments obtained against it. Employers Casualty Company completed its investigation of the accident on January 29, 1954. At that time, or shortly thereafter, based on the facts obtained from their investigation, Employers Casualty Company determined that there was no liability against J. Gordon Turnbull, Inc., on the lawsuits. Employers Casualty Company advised its reinsurer, Security Mutual Casualty Company, of the Reynolds plant accident and the facts developed by Employers' investigation thereof. With a knowledge of these facts, Security Mutual did not request*32 Employers Casualty to take any special action with regard to the possible liability of J. Gordon Turnbull, Inc., and stated that it appeared doubtful that Turnbull was guilty of any negligence. All of the cases filed against Turnbull were disposed of by a settlement which was finally arranged in October 1954, and judgments were entered on November 1, 1954. In settlement of the suits Employers Casualty Company paid $5,000 on behalf of Turnbull and obtained releases in all cases as a part thereof. Travelers Insurance Company paid $40,000 as insurer for Henry C. Beck Company and H. R. Henderson & Company, and James Stewart Company paid $4,350 in its own behalf. All the lawsuits were settled by the defendants for a total payment of $49,350. One reason the damage suits were settled for a total of $49,350 was all of the injured men, except Vincent Charo who was killed, had recovered, had returned to work, and were earning good money by the time the cases were settled. Eldon Dyer knew of the recoveries by the injured men, some of whom returned to work within a few weeks after the accident. In its accrual basis balance sheet of November 30, 1953, Turnbull was careful to show many reserves*33 for various expenses, including a $10,000 reserve for legal expenses on suits, but no reserve was established for any contingent liability on the lawsuits filed as a result of the Reynolds plant accident. The suits are not mentioned in a footnote to the balance sheet, although the petitions had all been filed prior to November 30, 1953. The officers of Price Construction Company were of the opinion that the extent of contingent liability on the lawsuits would not exceed insurance coverage of $50,000, and no further indication of any contingent liability was made on the balance sheet of Price Construction Company as of February 28, 1954, which statement was examined by Q. B. Carlile, C.P.A., and as to which he rendered a qualified opinion. At no time did either J. Gordon Turnbull, Inc., or Price Construction Company make any payment with regard to the lawsuits resulting from the Reynolds plant accident. In the breach of contract suit filed by Jerry Clements against J. Gordon Turnbull, Inc., on May 7, 1953, the plaintiff claimed damages of $3,950. During 1953 the parties' attorneys negotiated a settlement of the case on the basis of $750, but Clements' attorneys were unable to*34 contact him to obtain his approval. They requested, and on February 26, 1954, were permitted, to withdraw as counsel. On March 19, 1954, the case was dismissed for lack of prosecution. On its income tax return for the year December 1, 1953, through November 30, 1954, J. Gordon Turnbull, Inc., reported a gain on sale of its accounts receivable in the amount of $158,726.20. In computing the tax due on this return, J. Gordon Turnbull, Inc., prorated this gain, along with all its taxable income, between its separate return for the taxable period December 1, 1953, through February 4, 1954 (66 days), and the period February 5 through November 30, 1954 (299 days). For the latter period, the income of J. Gordon Turnbull, Inc., so prorated, was included in the consolidated return filed with and in the name of its parent company, H. R. Henderson & Company. In the notice of deficiency pertaining to the consolidated return of H. R. Henderson & Company and J. Gordon Turnbull, Inc., for the taxable year 1954 (Docket No. 1285-62), respondent determined that the income reported on said consolidated return should be increased by the amounts collected on the accounts receivable of J. Gordon Turnbull, *35 Inc., during the period from February 4, 1954, through December 31, 1954, which collections amounted to $423,777.25. Respondent further determined that this sum could properly be reduced by a basis in said accounts of $41,273.80, collection expenses of $13,550.48 and the gain from sale of receivables reported by J. Gordon Turnbull, Inc., on its return for the period December 1, 1953, through November 30, 1954, in the amount of $158,726.20, leaving the determined increase in reported consolidated income for 1954 from this adjustment of $210,226.77. A similar determination was made in 1955, increasing reported consolidated income for 1955 by $45,831.09. By adjustment (h) in the deficiency notice in Docket No. 1285-62, respondent makes no further adjustment increasing the consolidated income of H. R. Henderson & Company and J. Gordon Turnbull, Inc., for 1954, but rather makes the determination that certain items of income or deduction, as shown on the books of J. Gordon Turnbull, Inc., for its fiscal year ended November 30, 1954, including the $158,726.20 reported gain on sale of receivables, relate specifically to the period covered by the consolidated return filed with its parent*36 company. The decrease in affiliated income resulting from such reallocation amounts to $5,211.83. In the deficiency notice pertaining to the short taxable year of J. Gordon Turnbull, Inc., ended February 4, 1954 (Docket No. 88456), respondent determined that the $158,726.20 which J. Gordon Turnbull, Inc., reported as gain on sale of accounts receivable, should be completely reallocated to said short taxable year. As a result of the issuance of notices dated May 13, 1960 (Docket No. 88456), and January 22, 1962 (Docket No. 1285-62), the sum of $158,726.20 was twice included in income since the sale of the accounts receivable was recognized by the Commissioner in his notice dated May 13, 1960 (Docket No. 88456), for the taxable year ended February 4, 1954, and the sale was not recognized by the Commissioner in his notice dated January 22, 1962 (Docket No. 1285-62), for the year ended December 31, 1954, but was considered by the Commissioner to have been income which was not reported on the consolidated return of H. R. Henderson & Company and J. Gordon Turnbull, Inc., for the year 1954. The $368,952.97 gain which respondent included in the deficiency notice of Turnbull, Inc., pertaining*37 to taxable year ended December 31, 1954, was not removed from income of Price Construction Company in the deficiency notice dated September 27, 1961 (Docket No. 95189), to that corporation, which notice respondent issued pertaining to its fiscal year ended April 30, 1958. The deficiency notice issued to Price Construction Company disallowed a net operating loss carryover with a determination that such carryover had been previously claimed as a deduction for the year ended April 30, 1955. In the examination of Price Construction Company's income tax return for the taxable years April 30, 1955, 1956, and 1957, respectively, the revenue agent rendered a no change report which was accepted by the Commissioner containing the following statement: Since some of the gross income reported by this Corporation has been allocated to H. R. Henderson & Company and at informal conference held on that issue, taxpayer prefers not to execute an agreement to the no change shown above. Had respondent removed the proceeds from the collection of said accounts receivable from Price Construction Company's income, when he determined them to be taxable to Turnbull, Inc., the operating loss deduction would*38 have carried over to fiscal year ended April 30, 1958, of Price Construction Company. Respondent determined that $5,753.26 claimed as a deduction for legal and professional expenses in the consolidated return of H. R. Henderson & Company and J. Gordon Turnbull, Inc., for 1954 was not ordinary and necessary expense and was not allowable as a deduction. The items comprising the sum disallowed are as follows: 2-26-54Smith & Hall, AttorneysDebt of Price Construction Co.$2,253.263- 4-54Smith & Hall, AttorneysServices rendered J. Gordon Turnbull -trips to Dallas and Cleveland1,650.004- 6-54C. J. Demmer & CompanyServices rendered to Henderson in con-nection with acquisition of commonstock of Turnbull1,600.002-16-54Peat, Marwick, Mitchell & Co.Consuitations connected with proposedacquisition of Turnbull billed to Mc-Elroy Construction Co.250.00Total$5,753.26The $1,600 fee to C. J. Demmer & Company disallowed by respondent as not being an ordinary and necessary expense was paid to C. J. Demmer & Company for services rendered in connection with the acquisition of the common stock of J. Gordon Turnbull, *39 Inc., and the purchase of accounts receivable of J. Gordon Turnbull, Inc., by Price Construction Company. Smith & Hall, Attorneys, Marshall, Texas, were consulted with regard to H. R. Henderson & Company's acquisition of the common stock of J. Gordon Turnbull, Inc. H. R. Henderson's acquisition of the common stock of J. Gordon Turnbull, Inc., and Price Construction Company's acquisition of the accounts receivable of J. Gordon Turnbull, Inc., were planned by the same persons and executed as part of the same transaction. For each of the taxable years 1954 and 1955 H. R. Henderson & Company filed a consolidated income tax return with its subsidiary, J. Gordon Turnbull, Inc. Attached to each of these returns is Form 1122 in which J. Gordon Turnbull, Inc., consents to and agrees to be bound by the provisions of the consolidated return regulations. Each of these forms bears the seal of the subsidiary corporation, and the Form 1122 for 1955 is signed by its president. In the notice of deficiency dated January 22, 1962 (Docket No. 1285-62), respondent determined that income tax deficiencies for the taxable years ended December 31, 1954, and December 31, 1955, were due from H. R. Henderson*40 & Company (dissolved) and its affiliated company, J. Gordon Turnbull, Inc. Respondent further determined that Turnbull, Inc. (formerly J. Gordon Turnbull, Inc.), was transferee of the assets of H. R. Henderson & Company, and as such was liable for the amount of the deficiencies due, plus interest as provided by law. Pursuant to the joint plan and agreement of merger between J. Gordon Turnbull, Inc., and H. R. Henderson & Company, entered into as of December 17, 1957, and effective December 31, 1957, H. R. Henderson & Company was merged with and into J. Gordon Turnbull, Inc., in a statutory merger pursuant to the provisions of the General Corporation Act of Ohio and the Texas Business Corporation Act of 1955, and the name of the surviving corporation, J. Gordon Turnbull, Inc., was changed to Turnbull, Inc. By the terms of the merger the outstanding stock of H. R. Henderson & Company was surrendered in fixed proportions in exchange for stock of Turnbull, Inc., the existence of H. R. Henderson & Company was terminated and it ceased to exist as of the effective merger date, December 31, 1957. The 1250 shares of J. Gordon Turnbull, Inc., stock then owned by H. R. Henderson & Company*41 was similarly transferred to the surviving corporation. The common stock of the surviving corporation which would have been distributable to H. R. Henderson & Company in return for the 1250 shares of J. Gordon Turnbull, Inc., which Henderson Company held at the time of the merger, was distributed instead directly to the former shareholders of H. R. Henderson & Company in proportion to their former holdings of its stock. Under the merger, Turnbull, Inc., assumed all debts, liabilities, and duties of H. R. Henderson & Company with the further provision that they attached to the surviving corporation and could be enforced against it to the same extent as if such debts, liabilities, and duties had been incurred or contracted by it. Robert G. Maloney, secretary of petitioner Turnbull, Inc., executed a transferee agreement, Form 2045, admitting that Turnbull, Inc., is the transferee of the assets of H. R. Henderson & Company and assuming and agreeing to pay all Federal taxes finally determined or adjudged as due from H. R. Henderson & Company for the taxable years 1954, 1955, and 1956, to the extent of its liability at law or in equity, as transferee within the meaning of section 6901 of the Internal Revenue Code*42 of 1954. For its fiscal year ended April 30, 1955, Price Construction Company reported on its return the sum of $244,118.41 as income described therein as "Excess of Receipts over Purchase Price of Accounts Receivable." On its income tax returns for each of its fiscal years ended April 30, 1951, through April 30, 1958, and for its taxable year May 1 through October 31, 1958, Price Construction Company reported net income or losses, without regard to net operating loss deductions, as follows: Reported NetFiscal YearIncome orEnded(Loss)4/30/51($100,450.20)4/30/52(41,319.73)4/30/53(108,818.13)4/30/54(12,138.62)4/30/55169,002.204/30/56(19,819.80)4/30/5720,738.814/30/5876,184.1910/31/58(4,906.92)In computing its taxable income for its fiscal year ended April 30, 1955, Price Construction Company took a net operating loss deduction in the amount of $169,002.20 for net operating loss carryovers claimed from each of its fiscal years ended April 30, 1951, April 30, 1952, April 30, 1953, and April 30, 1954. In computing its taxable income for its fiscal year ended April 30, 1958, Price Construction Company took a net operating*43 loss deduction in the amount of $76,184.19 for the net operating loss carryover from its fiscal year ended April 30, 1953. In the notice of deficiency issued to Price Construction Company for its fiscal year ended April 30, 1958, respondent determined that the net operating loss of $76,184.19 claimed on the return for that year was unallowable since Price had previously claimed the same amount as a deduction from its income for the year ended April 30, 1955. Opinion Issue 1 Turnbull, Inc., denies its liability for the asserted deficiencies as a transferee because the notice of transferee liability does not place the primary tax liability of J. Gordon Turnbull, Inc., in issue and is therefore void. Alternatively, Turnbull, Inc., contends its liability as a transferee has not been proved by the respondent. It is respondent's position that Turnbull, Inc., is liable as transferee for deficiencies determined as due for 1954 and 1955 from H. R. Henderson & Company, transferor. H. R. Henderson & Company is thus primarily liable for the determined deficiencies and its liability was assumed by Turnbull, Inc., under the terms of the statutory merger agreement, in which all of Henderson's*44 assets were transferred to the surviving corporation and Henderson was dissolved. Based on this contractual assumption of liability, respondent contends that Turnbull, Inc., is liable for the determined deficiencies as a transferee at law, and as such the respondent need not prove that the net value of assets transferred exceeded the asserted deficiencies. We agree with the respondent's position. For each of the calendar years 1954 and 1955, H. R. Henderson & Company filed a consolidated income tax return with its subsidiary, J. Gordon Turnbull, Inc. The income of J. Gordon Turnbull, Inc., from February 5 through December 31, 1954, is includable in the consolidated return for 1954. In the notice of deficiency dated January 22, 1962 (Docket No. 1285-62), respondent determined that deficiencies in income tax for the taxable years ended December 31, 1954, and December 31, 1955, were due from H. R. Henderson & Company (dissolved) and its affiliated company, J. Gordon Turnbull, Inc. Under the applicable provisions of the Internal Revenue Code of 1954 the privilege of making a consolidated*45 return is based on the condition that all the corporations which comprise the affiliated group (H. R. Henderson & Company and J. Gordon Turnbull, Inc., in this case) consent to all the consolidated return regulations prescribed under section 1502. The regulations under section 1502 apply to the years now before the Court. See sections 1.1502-0 and 1.1502-1(b), Income Tax Regs.In accordance with section 1.1502-12(b) of the regulations, J. Gordon Turnbull, Inc., executed and attached to each of the consolidated returns for 1954 and 1955 a Form 1122, consenting to the regulations under section 1502 and authorizing H. R. Henderson & Company to make a return on its behalf. The notice of deficiency in the instant case was properly mailed to the transferee of Henderson, the parent company, as provided in the regulations. See section 1.1502-16(a), Income Tax Regs.The regulations further provide that the common parent and each subsidiary member of an affiliated group during any part of a consolidated return period is severally liable for the tax for the consolidated*46 period, including any deficiency with respect thereto. Section 1.1502-15(a). The tax liability for each corporation for each consolidated period is to be computed, in general, on consolidated taxable income of the affiliated corporations. Section 1.1502-30. Thus, H. R. Henderson & Company, the parent corporation in whose name the consolidated returns for 1954 and 1955 were filed, was liable for the entire amount of tax due as shown on each return and is liable for any deficiency determined and adjudged applicable to each year as a result of an increase in consolidated taxable income Under the applicable regulations the affiliated corporation is similarly liable for any tax and deficiency based on the entire amount of consolidated taxable income in each year. It therefore follows that both H. R. Henderson & Company and J. Gordon Turnbull, Inc., are primarily liable for any deficiency in income tax due for either of the years 1954 and 1955, based on the entire amount of consolidated taxable income as adjusted. Turnbull, Inc., admits that it is the transferee of the assets of H. R. Henderson & Company, and further admits that it has assumed and agreed to pay all Federal income taxes*47 finally determined or adjudged as due from H. R. Henderson & Company for the taxable years 1954 and 1955, "to the extent of its liability at law or in equity, as a transferee within the meaning of section 6901 of the Internal Revenue Code of 1954." Respondent claims that the extent of Turnbull, Inc.'s liability as a transferee is governed by the terms of the merger agreement between J. Gordon Turnbull, Inc., and H. R. Henderson & Company, and that under the terms of this merger Turnbull, Inc., is liable at law for the full amount of the deficiencies determined herein. Pursuant to the joint plan and agreement of merger between J. Gordon tturnbull, Inc., and H. R. Henderson & Company, entered into as of December 17, 1957, and effective December 31, 1957, H. R. Henderson & Company was merged with and into J. Gordon Turnbull, Inc., in a statutory merger pursuant to the provisions of the General Corporation Act of Ohio and the Texas Business Corporation Act of 1955, and the name of the surviving corporation, J. Gordon Turnbull, Inc., was changed to Turnbull, Inc. By the terms of the merger, the outstanding stock of H. R. Henderson & Company was surrendered in*48 fixed proportions in exchange for stock of Turnbull, Inc., the existence of H. R. Henderson & Company was terminated and it ceased to exist as of the effective merger date, December 31, 1957. The 1250 shares of J. Gordon Turnbull, Inc., stock then owned by H. R. Henderson & Company were similarly transferred to the surviving corporation. The common stock of the surviving corporation which would have been distributable to H. R. Henderson & Company in return for the 1250 shares of J. Gordon Turnbull, Inc., which Henderson Company held at the time of the merger, was distributed instead directly to the former shareholders of H. R. Henderson & Company in proportion to their former holdings of its stock. As a result of the merger and distribution to Turnbull, Inc., of all of the assets of H. R. Henderson & Company, Henderson was left without assets or property of any value and its existence ceased on December 31, 1957. Under the merger, Turnbull, Inc., "assumed all debts, liabilities and duties" of H. R. Henderson & Company with the further provision that they attached to the surviving corporation and could be enforced against it to the same extent as if such debts, liabilities, and duties*49 had been incurred or contracted by it. Included in the debts assumed in the merger by Turnbull, Inc., was any additional tax liability of H. R. Henderson & Company for 1954 and 1955, for on the effective date of the merger all the events had occurred which fixed the amount of the tax and determined H. R. Henderson & Company's liability with regard thereto. Continental Baking Co., 27 B.T.A. 884 (1933), affd. 75 F. 2d 243 (C.C.A.D.C. 1934), certiorari denied 295 U.S. 756 (1935). Where a transferee receives all of the assets of a transferor, after which the transferor is dissolved, and there is a contractual agreement by the transferee to assume the debts and pay the liabilities of the transferor, the transferee is liable, as a matter of law, for income tax liability of the transferor for periods prior to the transfer. In asserting transferee liability at law, as distinguished from liability in equity, respondent need not prove the value of assets transferred, but is entitled to rely on the transferee's contractual liability. See American Equitable Assurance Co. of New York, 27 B.T.A. 247 (1932),*50 affd. 68 F. 2d 46 (C.C.A. 2, 1933); and Kamen Soap Products Co., Inc., v. Commissioner, 230 F. 2d 565 (C.A. 2, 1956). Cases cited by petitioner - Estate of Joseph Nitto, 13 T.C. 858 (1949); Ludwig Vogelstein, 16 B.T.A. 947 (1929); and Elaine Yagoda, 39 T.C. 170 (1962) - are distinguishable since they each involve an attempted assertion of transferee liability in equity rather than at law. In none of the cited cases did the alleged transferee contractually assume the existing liabilities of the transferor. In cases involving statutory mergers where the surviving corporation assumed the liabilities of the merged corporation, it has been held that the survivor was liable as transferee for the tax liability of the merged corporation. See Texsun Supply Corporation, 17 T.C. 433 (1951); and Kaufmann Department Stores Securities Corporation, 2 T.C. 656 (1943), affd. 144 F. 2d 776 (C.C.A. 3rd 1944), which involved a merger almost identical to that in the instant case. Issue 2 As we*51 view it, whether the collections realized during 1954 and 1955 on the accounts receivable are taxable to J. Gordon Turnbull, Inc., or to Price Construction Company depends entirely on whether the sale to Price was an arm's length transaction for valuable consideration. The petitioners argue that it was. Respondent disagrees and submits that the sale was without substance and invalid for tax purposes. The resolution of this question must be determined from all the facts and circumstances involved. Both parties agree that accounts receivable may be assigned in an arm's length transaction for valuable consideration, and that under such circumstances the assignor is subject to tax on the purchase price received and the assignee is taxable only to the extent that the collections he receives exceed his basis. Lewis N. Cotlow, 22 T.C. 1019 (1954), affd. 228 F. 2d 186 (C.A. 2, 1955). But respondent's position is that in the instant case the necessary prerequisites to this general principle are lacking. Viewing the evidence in its entirety on this factual issue, we are*52 persuaded that the assignment of the accounts receivable was not a valid arm's length transaction for valuable consideration. While our Findings of Fact are complete in this respect, there are a few points that warrant our comments. An arm's length transaction generally means one between parties with adverse economic interests. To determine whether a sale between two corporations is at arm's length, it is necessary to look at the stockholders behind the corporate structure. Campana Corporation v. Harrison, 114 F. 2d 400 (C.C.A. 7, 1940). Here the economic interests of H. R. Henderson & Company and Price Construction Company were the same since they were controlled by the same stockholders, H. R. Henderson, Cameron McElroy, Jr., and B. C. McElroy, Sr. From 1946 to April 15, 1958, these three men owned 90 percent of the outstanding stock of H. R. Henderson & Company and 58 percent of the stock of Price Construction Company on February 4, 1954, the date of the assignment. Moreover, there was no adverse economic interest between J. Gordon Turnbull, Inc., and Price Construction*53 Company on February 4, 1954, since Turnbull was then controlled by H. R. Henderson & Company. We think the principal purpose of the assignment of Turnbull's accounts receivable to Price was to avoid the income tax that would be due upon their collection. Price had reported net operating losses of $100,450.20, $41,319.73, and $108,818.13 for each of its 3 fiscal years ended April 30, 1951, 1952, and 1953, respectively, and these losses were available to be carried forward and offset against the amounts to be collected on the Turnbull receivables. Since Price would be able to realize this income tax free, Henderson Company could then recover from Price the funds it had previously advanced to enable Price to carry on its operations. It thus seems clear to us that the sole purpose of the transfer of the accounts to Price, rather than their being acquired by Henderson, was to avoid tax liability, and that Henderson's acquisition of the Turnbull stock and the transfer of the accounts to Price were planned and executed as part of the same transaction. After the death of J. Gordon Turnbull, his corporation ceased to engage actively in business until after February 4, 1954. On November 30, 1953, J. *54 Gordon Turnbull, Inc., was in excellent financial condition and had cash of $521,713.77, current assets substantially in excess of all liabilities and revenues, and a large amount of accumulated capital and surplus ($1,006,443.50 on an accrual basis; $805,297.10 on a cash basis). By February 4, 1954, the corporation was in an even more liquid position as it sold most of its fixed assets at their book value as of December 31, 1954, to Susan A. Turnbull for a total cash price of $240,120.40. The board of directors of Turnbull recognized that the cash position of the corporation on February 4, 1954, was such that it could loan a substantial sum to H. R. Henderson & Company. In the light of Turnbull's exceptionally good cash and financial condition and its restricted operations from April 1, 1953, through February 4, 1954, there was no valid business purpose for its selling approximately $420,000 of accounts receivable, as to which there was little doubt of collectibility, for $50,000 cash, the assumption of virtually non-existent contingent liability, and a $150,000 90-day note, the payments on which would be based on the amounts actually collected on the receivables themselves. Turnbull*55 merely had to collect these accounts, and it could afford to do so since its cash on hand vastly exceeded the requirements of its then inactive business. As of February 4, 1954, there was little doubt as to the collectibility of the accounts receivable assigned, and that they were worth approximately $420,526.98, the total uncollected balances due thereon. Each of these accounts, or jobs, had previously been carefully studied and analyzed, the determined percentage of completion on each job verified, an analysis made of previous payments, and the balances due at February 4, 1954, conservatively calculated to be $420,526.98. Two major facts support respondent's contention that the receivables were worth about $420,000 on February 4, 1954. First, immediately following the assignment large sums were received within a short period. The actual collections on these accounts totaled $469,608.34. By the end of June 1954, a little less than 5 months after the assignment, $393,608.89 had been collected on the assigned accounts; by December 31, $423,777.25 had been received; and an additional $45,831.09 was collected in January and February 1955. From the large amount and rapidity of these*56 collections, the full value and collectibility of these accounts is clearly confirmed. The officers of Turnbull must have had complete knowledge that these amounts were worth at least $420,000, and that such sum could be quickly and easily collected if and when they desired to do so. Second, that the officers of Turnbull were cognizant of the actual value of the receivables is shown by the fact that in estimating its 1954 income from these accounts, total estimated income of $539,957.25 was reduced by a valuation reserve aggregating only $26,997.86. These accounts were shown on the accrual basis balance sheet of J. Gordon Turnbull, Inc., as of November 30, 1953. The important point is that a valuation reserve of $26,997.86 was considered adequate to cover not only those accounts assigned to Price on February 4, 1954, but also other receivables totaling a much larger amount of receivables than those assigned to Price. As Turnbull made the collections on the assigned accounts, it immediately sent the proceeds to Price Construction Company. From these collections Price paid its $150,000 note to Turnbull and was able during 1954 to return most of the funds previously furnished it by*57 H. R. Henderson & Company. In effect, Price merely served as a conduit for Henderson to withdraw earnings and funds from Turnbull tax free. These accounts were assigned to Price Construction Company for $50,000 in cash, plus a 90-day note for $150,000 and the assumption of any liability Turnbull might have as a result of certain lawsuits filed against it, principally those resulting from an accident at the Reynolds Metals Company plant in Gregory, Texas. We agree with respondent's contention that the recited assumption of these contingent liabilities was meaningless and of no value as consideration because, as the parties knew when they drafted the assignment, any possibility of such contingent liability was so remote as to be virtually non-existent. See our discussion of this matter in the related case of J. Gordon Turnbull, Inc., 41 T.C. No. 39 (December 12, 1963). Thus, we regard the consideration received by J. Gordon Turnbull, Inc., for the assignment of the accounts receivable as wholly inadequate. In essence, what happened here is that Turnbull transferred receivables having a value of approximately $420,000 for a consideration of only $200,000. Under these*58 circumstances we are unwilling to allow Turnbull to shift the tax due on income which it had clearly earned and was merely waiting to collect. See J. Ungar, Inc., 26 T.C. 331 (1956), affd. 244 F. 2d 90 (C.A. 2, 1957); Wood Harmon Corporation v. United States, 311 F. 2d 918 (C.A. 2, 1963). Cases cited by the petitioners, such as Jones v. Commissioner, 306 F. 2d 292 (C.A. 5, 1962), and Wellhouse v. Tomlinson, 197 F. Supp. 739 (S.D.Fla., 1961), are distinguishable on their facts. Accordingly, we hold that the collections during 1954 and 1955 on the accounts receivable assigned to Price Construction Company are taxable to J. Gordon Turnbull, Inc., and includable in the consolidated taxable income of H. R. Henderson & Company and affiliate for each of those years. In so holding it becomes unnecessary for us to consider respondent's alternative argument as to the applicability of section 482, Internal Revenue Code of 1954. Issue 3 Petitioner's contention that it is entitled to an additional decrease in affiliated income of $158,726.20 appears to be incorrect. In the notice of deficiency*59 pertaining to the consolidated return of H. R. Henderson & Company and J. Gordon Turnbull, Inc., for the taxable year 1954 (Docket No. 1285-62), respondent determined that the income reported on the consolidated return should be increased by the amounts collected on the accounts receivable of J. Gordon Turnbull, Inc., during the period from February 4, 1954, through December 31, 1954, which collections amounted to $423,777.25. Respondent further determined that this sum could properly be reduced by a basis in said accounts of $41,273.80, collection expenses of $13,550.48, and the gain from sale of receivables reported by J. Gordon Turnbull, Inc., on its return for the period December 1, 1953, through November 30, 1954, in the amount of $158,726.20, leaving the determined increase in reported consolidated income for 1954 from this adjustment of $210,226.77. By adjustment (h) in the deficiency notice in Docket No. 1285-62, respondent makes no further adjustment increasing the consolidated income of H. R. Henderson & Company and J. Gordon Turnbull, Inc., for 1954, but rather makes the determination that certain items of income or deduction, as shown on the books of J. Gordon Turnbull, *60 Inc., for its fiscal year ended November 30, 1954, including the $158,726.20 reported gain on sale of receivables, relate specifically to the period covered by the consolidated return filed with its parent company. By this adjustment respondent is treating the petitioner as if the transfer of receivables had never occurred; that is, adjustment (h) computes what Turnbull's portion of consolidated taxable income would have been if it had reported the entire gain on sale receivables ($158,726.20) in the consolidated period February 5 through December 31, 1954, rather than only 299/365 of the gain. Then, in adjustment (f), the entire amount of the reported gain ($158,726.20) is allowed as a deduction, not just 299/365 of such gain, as was originally reported in the consolidated period. As we see it, the net effect of adjustments (f) and (h) is to disregard the assignment of the accounts receivable and to increase consolidated taxable income by $210,226.77, thus allowing petitioner credit for the full amount of income ($158,726.20) reported on the return for its fiscal year ended November 30, 1954, but which Turnbull had allocated 66/365 to the short period ended February 4, and 299/365 to*61 the long period ended December 31, 1954. Issue 4 Respondent determined that $5,753.26 claimed as a deduction for legal and professional expenses in the consolidated return of H. R. Henderson & Company and J. Gordon Turnbull, Inc., for 1954 was not ordinary and necessary expense and was not allowable as a deduction. These items are set forth in our Findings of Fact. The petitioner Turnbull, Inc., does not discuss the disallowance of these claimed deductions in either its original or reply brief. Consequently, it would appear that this issue has been abandoned by the petitioner. But, in any event, the issue is factual and the evidence on the point indicates that the $1,600 fee of C. J. Demmer & Company disallowed by respondent as not being an ordinary and necessary expense was paid to C. J. Demmer & Company for services rendered in connection with the acquisition of the common stock of J. Gordon Turnbull, Inc., and the purchase of accounts receivable of J. Gordon Turnbull, Inc., by Price Construction Company. The statement rendered to H. R. Henderson & Company by C. J. Demmer & Company shows that Smith & Hall, Attorneys, Marshall, Texas, were consulted with regard to H. R. Henderson*62 & Company's acquisition of the common stock of J. Gordon Turnbull, Inc. The rule that legal and professional fees paid in connection with the acquisition of capital stock are nondeductible capital expenditures is clearly established. Atzingen-Whitehouse Dairy, Inc., 36 T.C. 173 (1961). Similarly, legal fees paid on behalf of, and for services rendered to, another are not deductible as ordinary and necessary expenses of the payor. Royal Cotton Mill Co., 29 T.C. 761 (1958); and J. Gordon Turnbull, Inc., supra. Issue 5 Having determined that J. Gordon Turnbull, Inc., rather than Price Construction Company, is subject to tax on the collections from the accounts receivable assigned by Turnbull to Price, it follows, as we have found, that the respondent erroneously disallowed Price Construction Company the net operating loss deduction in its taxable year ended April 30, 1958, as a result of a net operating loss carry forward from its fiscal year ended April 30, 1953. Decisions will be entered under Rule 50. Footnotes1. Consolidated herewith for trial and opinion is the proceeding of Price Construction Co., Docket No. 95189.↩